UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

CARMEN CARDOSO,

                                                          05 Cr. 563 (RPP)

                          Defendant-Petitioner,

          -against -                                      **OPINION & ORDER**


UNITED STATES OF AMERICA,

                                    Respondent.

------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

          Petitioner Carmen Cardoso ("Petitioner" or "Cardoso"), presently subject to a sentence of 150 months imprisonment imposed by this Court on April 10, 2007, seeks to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255 on the ground that at the time of her sentence, the government violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963) and 18 U.S.C. § 3500/Federal Rule of Criminal Procedure 26.2 by not disclosing impeachment material to the defense.  Petitioner also requests further discovery.  Oral argument on this motion was held on March 26, 2009.

          For the reasons set forth below, Petitioner's motion is granted to the extent that, should she so elect, Petitioner shall be resentenced by this Court on August 21, 2009 at 10:00 a.m. in Courtroom 24A.  Petitioner's motion for additional discovery is denied.

**1. Factual Background**

          A. The Indictment and Trial Overview

Under Indictment 05 Cr. 563, Petitioner was charged with three counts: conspiracy to import one kilogram and more of heroin and five kilograms and more of cocaine from 2003 to 2005; conspiracy to distribute and to possess with intent to distribute one kilogram and more of heroin and five kilograms and more of cocaine from 2003 to 2005, and; conspiracy to commit money laundering.

Trial commenced on October 16, 2006.  The evidence at trial consisted of testimony and tape recordings showing that in October-November 2003, Petitioner's significant other, Nelson Solano ("Solano"), sought the assistance of two government informants, Papi Luna ("Papi") and Oscar Torres ("Oscar"), in bringing 200 kilograms of cocaine into the United States from South America, by boat.  Telephone calls between Oscar and Solano and a meeting between the two at a restaurant in Philadelphia confirming the purpose of the meeting were recorded.  In a telephone call a couple of weeks later, Solano and Oscar also discussed the possibility of getting drugs on credit from South America by having Solano be held hostage to guarantee payment.  (Govt. Ex. IT.2, IT.4.)  Petitioner was part of this plan.  She had a call with Papi in which she advised him that the drugs would be coming through Antigua and not through Haiti.  At the end of that call, Petitioner told Papi that she would let Solano, who was in South America, know that Oscar was just about ready to carry out this plan.  (Govt. Ex. IT.3.)

Next, in early 2004, Petitioner tried to arrange with Oscar for scuba divers to unload 125 kilograms of cocaine from the bottom of a boat; for his services, Oscar would receive $400 per kilogram.   (Govt. Ex. IT. 5(a), (b).)   Petitioner even went to Philadelphia in March 2004 to meet with Oscar and the two men, Kiko and Vic, who needed the scuba divers to unload the cocaine.  Oscar claimed that the water was too cold

and he sought more information as to the exact location of the boat for surveillance purposes; Petitioner tried hard to change his mind.  (Govt. Ex. 6(a).)

In 2003-2004, Petitioner also assisted in another plan of Solano, to supply heroin to Henry Jiminez (a/k/a Frank).  In 2003, Denise Butler agreed to act as a drug courier for Jiminez, and to bring heroin from Venezuela to the United States in October 2003. Petitioner used her own telephone and a phony name to make a round trip air reservation for Ms. Butler to Venezuela and back.  (Govt. Ex. 2A.)  In February 2004, Solano called Israel Cintron and told him that drugs would be arriving in Atlanta within the next few days.  (Govt. Ex. 2T.1.)  Two days later, Butler was arrested in the Atlanta airport coming from Venezuela with heroin in her suitcase.  (Govt. Ex. 2T.3.)  Petitioner called Cintron two weeks later and told him that "Frank" had told Solano that the drugs had been seized but that she did not believe it because Frank was in such good spirits.  (Govt. Ex. 2T.3.) In March 2004, however, Petitioner called Cintron and warned him that Frank had been arrested.  Cintron said, "I am going to change everything!"  Petitioner responded, "Yes, that's why I am calling you."   Defendant closed the conversation saying, "To be forewarned is to be forearmed."  (Govt. Ex. 2T.5.)

The trial testimony next involved the testimony of Miguel Diaz, who stated that in November 2004, a shipment of heroin had arrived in the United States.  Diaz's testimony was supported in part by his two cell phones, which corroborated that in the hours prior to his arrest while he was awaiting the delivery of heroin to his house, he was in touch with Petitioner and Solano, who was in Colombia.  (Govt. Ex. 3P1, 3P2.)

Diaz, who had arranged that Edward Pena would drive the shipment of heroin up to New York from Texas,[1] testified that about an hour before he was arrested, he confirmed with Petitioner, to whom, ("Jeffrey" amongst others), he was supposed to deliver the heroin.  Petitioner and Solano's involvement in the shipment of heroin was confirmed by the testimony of her son, Edward Cardoso.  Petitioner called Edward Cardoso to tell him of Diaz's arrest, and she stated that she was concerned that she could be arrested as well.  Edward Cardoso testified that he helped Petitioner raise and pay $108,000 for Solano's release in Colombia.  Edward Cardoso also testified that Petitioner sent him to the authorities to photocopy Diaz's and Pena's court papers in order to send those papers to Colombia as proof that the heroin had been seized and not stolen.

Lastly, in February 2005, Petitioner told Edward Cardoso that she and Nelson Solano were arranging to have 3-5 kilograms of cocaine delivered to Edward, and she described how the cocaine should be distributed, including that some should be distributed to "Jeffrey."  (Govt. Ex. 5T.1.)  It is clear from the evidence that Petitioner was involved with Solano in several conspiracies to import cocaine and heroin into the United States.

Petitioner testified in her own defense.  In general she did not dispute the government's evidence, but argued instead that her statements on the wiretap recordings were explained by the fact that she was acting as a government informant posing as a narcotics trafficker.  Petitioner testified that she understood that she was authorized to engage in most of this conduct by a DEA agent and subsequently, by a New York City Police Department narcotics task force detective to whom she was providing information.

---

[1] The heroin was seized in Pena's possession during a traffic stop in Mississippi, and a controlled delivery to Diaz was later arranged.

The jury began its deliberations on October 31, 2006, and Petitioner was found guilty on count one (conspiring to import five kilograms or more of cocaine and one kilogram of heroin) and on count two (conspiring to possess and distribute one kilogram or more of heroin and five kilograms or more of cocaine).  The third count (money laundering) had been dismissed during trial.

B. The Testimony of Miguel Diaz At Trial

Miguel Diaz testified against Petitioner pursuant to a cooperation agreement with the government.  (Declaration of George Royal, dated October 21, 2008 ("Royal Decl."), Ex. P [trial transcript] at 484-85.)  Diaz claimed that Petitioner participated in a scheme in which he and several other co-conspirators, including Nelson Solano, imported and planned to distribute approximately five kilograms of heroin from Colombia in late 2004. (Id.)  He testified that after first meeting Petitioner in early 2004, he and Petitioner and Nelson Solano met several times and discussed "[p]ossibilities of firming up drug deals and different scenarios that could occur … [for] bringing in drugs from another country." (Id. at 508-09.)

During these meetings, Petitioner and Diaz spoke "about many different possibilities about drugs that were going to come in," but shortly thereafter, in late 2004, Petitioner "told [Diaz] that [they] could get heroin in Colombia … on credit," but "that [they would] have to go and pick it up, because it wasn't going to come directly to New York City."  (Ex. P at 511-512, 514-15.)  Petitioner asked Diaz if he knew someone who could retrieve the heroin from Houston, Texas, and he told her that he did.  (Id. at 512-13.)  Diaz's planned courier was unavailable, however, so Petitioner told Diaz someone would have to "travel down" to Houston to collect the heroin, and that once she had "the

information a hundred percent for sure," Petitioner would tell Diaz where to collect the drugs.  (Id. at 513.)  Petitioner then corrected the location and told Diaz that the drugs would instead be at a location in Lake Charles, Louisiana.  (Id. at 514-15.)   Diaz then arranged for Edward Pena to pick up the heroin.

In March 2006, Diaz signed a cooperation agreement with the government pledging "to provide the government with all necessary information about criminal activities and to tell the truth about everything."  (Ex. P at 485.)  Specifically, the agreement provided that Diaz "shall bring to this office's attention all crimes which he has committed …" and that he "shall commit no further crimes whatsoever."  The government also elicited testimony from Diaz about the parameters of his activities as a government cooperator.  Diaz testified that he told law enforcement about his contacts with certain drug traffickers "right away" after he had them.  (Ex. P at 577.)  Diaz also stated that he did not make any contacts with drug traffickers without getting "specific approval from the agents," and that he understood that he would be in "big trouble" and would put his cooperation agreement at risk if he did not do so.  (Id. at 578.)

C. Petitioner Disputed Diaz's Trial Testimony.

Petitioner testified that Diaz, not she, was the supervisor of the scheme to import heroin from Colombia in late 2004.  According to Petitioner, Diaz appeared in front of her building one day with a "Dominican girl." (Ex. P at 1135.)  Diaz told Petitioner that there was heroin ready to be picked up, and that he wanted to send the Dominican girl to pick up the heroin from his suppliers.  (Id. at 1135.)  Petitioner denied that she had organized the importation of the heroin from Colombia in late 2004, or that she had ever told Diaz where drugs were in Texas.  (Id.)  Instead, Petitioner claimed, it was Diaz who

6

had learned directly from his suppliers where the drugs could be retrieved.  (Id. at 1135-36.)  Petitioner also testified that after a courier (Pena) had been sent to retrieve the heroin in Texas, Diaz "would call [her] everyday to tell [her] what was going on," and that on the day the heroin was to arrive, Diaz came to her apartment and announced that he would locate the person who was to deliver it.  (Id. at 1139).

     D.  The April 10, 2007 Sentencing Proceedings

The presentence report prepared by the Probation Office calculated the Guidelines range to be 324 to 405 months, based on an offense level of 41 and Criminal History Category I.   38 levels were allotted for the amount of narcotics involved, and an additional three-level enhancement was warranted because Petitioner had supervised two co-conspirators, Edward Pena and Miguel Diaz, during the November 2004 shipment of heroin from Colombia.  In a pre-sentencing memorandum, defense counsel argued that Petitioner was not a supervisor of the November 2004 importation of heroin, and that she should not be sentenced to anything more than the 10-year mandatory minimum.  The Government opposed defense counsel's arguments, and further requested an enhancement for obstruction of justice based on Petitioner's allegedly false trial testimony.

The parties appeared for sentencing on April 10, 2007.  The Court first addressed the issue of drug quantity, finding that it would not take into account a purported 200-kilo shipment of cocaine (Count One), and therefore, the base offense level was determined to be 36.  (04/11/2007 Sentencing Transcript ("Sentence Tr.") at 31.)  Next, with regard to the alleged "supervisory role" played by Petitioner, the government contended that the

"evidence regarding [a] supervisory role[ ]" stemmed from Diaz's testimony concerning Petitioner's alleged supervision of the heroin shipment from Colombia.  (Id. at 40.)

The government then read portions of Diaz's testimony into the record.  These portions of testimony related to Diaz's testimony that: it was Petitioner who first told him that heroin could be shipped from Colombia and where this heroin would be collected in the United States; that it was Petitioner who ordered Diaz, upon retrieval of the heroin, to sell part of the drugs and give another part to a "guy called Jeffrey" and; that it was Petitioner who, in a supervisory role, provided Diaz with advice on whom to deal with to obtain the heroin.  (Sentence Tr. at 40-47.)  Petitioner challenged the government's conclusion that the aforementioned proof represented a supervisory position, and also argued that her testimony at trial was "directory contrary" to Diaz's trial testimony.  (Id. at 33, 46-50.)

Based on the trial record, which included use of conversations between Petitioner and Diaz, the Court determined that Petitioner was a supervisor, and as a result, the Court adjusted Petitioner's advisory offense level upwards by 3 points.  (Sentence Tr. at 50.)  As a result of the Court's finding that Petitioner was a supervisor, the Court commented that it could not "agree with the defense" that the "minor participant" point reduction available under Section 3B1.2(b) of the Guidelines applied.  (Id. at 51.)  The Court also did not hear argument on Petitioner's request to be sentenced below the statutory minimum because the Court's supervisor determination disqualified her for eligibility for the statutory "safety valve."  (Id. at 52; 18 U.S.C. § 3553(f)(4); U.S.S.G. § 5C1.2).  This put Petitioner's offense level at 39, which resulted in a Guidelines range of 262 to 327 months' imprisonment.

After hearing from the parties, and after hearing argument from defense counsel in an effort to persuade the Court to impose the statutory minimum term of ten years' imprisonment, the Court imposed a sentence of 150 months (12½ years) imprisonment. The Court acknowledged that the "narcotics situation in this country [wa]s serious," but stated that the drug laws were "over-tough." (Sentence Tr. 78-79.)  According to the Court, this was "one of the reasons" that it was inclined to impose a below-Guidelines sentence.  (Id.)  Another reason the Court gave for "not accept[ing] the guidelines sentence" was its belief that Petitioner's cultural background had caused her to take direction from Nelson Solano, a conspirator who was then in Colombia.  (Id. 78.)  As the Court made clear, "people who have been brought up in a Hispanic community, women, often take direction from men, but people who have been brought [up] in the United States don't, women who have been brought up here don't.  I think that is something I have to consider in leniency and did consider for leniency."  (Id.)

E. Diaz's Participation in a Conspiracy to Distribute Heroin, in Violation of his Cooperation Agreement.

In a written account of statements Diaz made to federal agents in November 2007 (Royal Decl., Ex. A [Diaz November 2007 Proffer]), as well as transcripts of certain February and March 2007 conversations mentioning Diaz that were recorded on a federal wiretap (Royal Decl., Ex. B [Wiretap Transcripts]), at some point in late 2006, Santiago Martinez, a drug trafficker whom Diaz had "introduced to the drug business" and who moved "3-4 kilograms of heroin each week," called Diaz and asked him for help in locating new customers.  (Royal Decl., Ex. A at 1-2.)  Diaz introduced Martinez to a heroin dealer he knew named "Moe," who then began receiving ten 22-gram "bricks" of heroin per week from Martinez.  (Id. at 2.)  Diaz also introduced Martinez to a second

drug dealer named Joel Fermin, but it turned out that Martinez was already a customer of Fermin.  (Id.)

In connection with distributing heroin to Moe, Diaz taught Martinez how to bag heroin at Martinez's apartment.  (Royal Decl., Ex. A at 2.)  Diaz also instructed a man who "worked with" Martinez, "Toney LNU," on how to bag heroin.  (Id.)  According to the November 2007 Proffer, Martinez paid Diaz a total of $40,000 in small installments beginning seven to eight months before July 2007, or sometime in November or December 2006.  (Id.)  The November 2007 Proffer was not specific about exactly when in relation to those payments Martinez first called Diaz looking for new customers, when Diaz instructed him and "Toney LNU" on packaging heroin, or when Martinez began distributing drugs to Moe.

In a conversation recorded on March 5, 2007, over a month before Petitioner's sentencing, Diaz explained to Martinez that he had sent some of his men to pick up a shipment of narcotics.  (Royal Decl., Ex. B at 153.)  In a subsequent conversation that same day, after Martinez complained that he owed money to "the guys," Diaz told Martinez that he would take care of "the guys" for Martinez.  (Id. at 164.)  And in a subsequent conversation, Diaz bragged to Martinez about his role in setting up and running Martinez's drug business.  (Id. at 35.)  Diaz, reflecting on the nature of the narcotics business, told Martinez, "I've learned a lot in this game.  Is the same as women. You understand!  In this business you have to have some brains.  You always have to balance things out.  There's moments to rob, work, and chop heads off, but there's other moments you have to respect.  It's a balance.  People don't understand that."  (Id. at 36.)

Martinez was arrested and charged with narcotics crimes on March 12, 2007. (Royal Decl., Ex. M [07-cr-285 Docket Report].)   According to the November 2007 Proffer, shortly after Martinez's arrest, Diaz and Toney LNU went to Martinez's apartment to recover Martinez's phone, cash and other items.  (Royal Decl., Ex. A at 3.) Diaz also called Fermin, who knew about the arrest, and Martinez, who, through a prearranged code, told Diaz that he had been arrested and was now working for the government.  (Id.)

> F. Prior to Petitioner's Sentencing, the Government Knew That Diaz Had Breached His Cooperation Agreement by Supervising a Drug Trafficking Ring.

DEA Agent Timothy Flaherty -- who supervised Diaz in his capacity as a government cooperator and had testified about Diaz's arrest at Petitioner's trial -- oversaw the wiretap of telephone lines linked to Martinez that generated the February and March 2007 wiretap transcripts.  (Royal Decl., Ex. C [March 15, 2007 DEA Report].) These transcripts demonstrated Diaz's participation in the heroin conspiracy.  Moreover, three days after Martinez's arrest in March 2007, Agent Flaherty and several other agents met with Diaz regarding Martinez's arrest.  (Id.)  In a March 15, 2007 report, Special Agent Flaherty wrote that Diaz lied to him when asked about whether he had told anyone about Martinez's arrest.  (Id.)  Diaz twice denied that he had, even though the government's wiretap had already recorded him calling Fermin and Martinez, shortly after Martinez's arrest.  (Id.)  The DEA report from the meeting noted that Diaz had lied about informing associates about Martinez's arrest, and it also noted that Diaz was "very concerned about" Martinez, and he "asked on several occasions for more details regarding his arrest."  (Id. at 2.)

Accordingly, at least two months before Petitioner was sentenced in April 2007, the government agents knew that Diaz was participating in a drug trafficking organization, and further, that Diaz was actively lying to law enforcement officials concerning these activities.

G. The Government Did Not Disclose Diaz's Involvement in the Heroin Trafficking Conspiracy Until January 2008.

Prior to Petitioner's sentencing on April 10, 2007, the prosecution did not disclose the evidence government agents had about Diaz's drug trafficking activity to Petitioner's counsel or to the Court.  (Royal Decl., Ex. D [01/28/08 letter from Government].)  Two months after Petitioner's sentencing, in June 2007, Diaz was interviewed by an Assistant United States Attorney.  After determining that Diaz was not admitting the full extent of his criminal conduct, the prosecutor sought to have Diaz's bail revoked.  Diaz was interviewed again by prosecutors and DEA agents in November 2007 and on January 25, 2008.  (Id.)  During those interviews, Diaz made further admissions establishing his involvement in drug-related activity near the time as when he testified at Petitioner's trial in October, 2006.  (Id.)

In a letter dated January 28, 2008, the government first disclosed Diaz's illegal activities by letter to Petitioner's counsel.  (Royal Decl., Ex. D.)  In that letter, the Government claimed that "in or about March 2007, the Government learned that Diaz, who was still on bail, was possibly involved in drug-related activity that was not authorized by any law enforcement officer."  (Id.)  Further, the government noted, "during meetings with [Diaz] in June 2007, November 2007 and January 2008, the Government confirmed that Diaz was involved in unauthorized drug-related activity during his release on bail, including during the fall of 2006."  (Id.)

12

In a February 7, 2008 reply, defense counsel requested additional information from the government regarding Diaz's involvement in unauthorized drug-related activity. (Royal Decl., Ex. E [02/07/08 letter from defense counsel].)  On February 19, 2008, the government turned over to Petitioner the November 2007 Proffer, other DEA reports from March 15, 2007 and June 11, 2007, and other notes of interviews between the government and Diaz.  (Royal Decl., Ex. F [02/19/08 letter from government].)   On February 27, 2008, the government disclosed the wiretap transcripts from February and March 2007 to defense counsel.  (Royal Decl., Ex. G [02/27/08 letter from government].)

By letter dated May 1, 2008, counsel for Petitioner requested additional information from the government about Diaz's activities, pointing out that the information the government had disclosed did not establish when Diaz had begun conspiring with others to traffic drugs.  (Royal Decl., Ex. H [05/01/08 letter from defense counsel].)  Counsel also stated that the information did not establish the earliest date by which the government knew or should have known that Diaz had resumed trafficking heroin.  (Id.)  The government responded by letter dated May 19, 2008 that it had "no additional documents to provide in response to" Petitioner's requests.  (Royal Decl., Ex. I [05/19/08 letter from government].)

Meanwhile, Petitioner had filed a timely notice of appeal on April 16, 2007, and the parties completed their appellate briefing on November 13, 2007.  Petitioner raised an unrelated Brady issue in her appeal.  On February 12, 2008, with Petitioner's appeal still pending, defense counsel filed a motion with the Court of Appeals asking that the appeal be held in abeyance in light of the Government's disclosures regarding Diaz.  Counsel specifically asked for time so that he could contemplate whether to file a Rule 33 motion

or motion to vacate sentence.  The Government opposed Petitioner's motion.  In August 2008, defense counsel's motion to hold the appeal in abeyance was denied by the Court of Appeals, and the appeal was scheduled for argument on October 20, 2008.

On October 17, 2008, defense counsel filed the instant habeas petition, seeking to vacate Petitioner's sentence.  The defense forwarded a copy of the petition to the Court of Appeals, explaining to the court that this habeas petition "demonstrates another instance of the government conduct [Petitioner] has raised in her appeal."  Oral argument on Petitioner's appeal was held on October 20, 2008.  At oral argument, the court queried Petitioner's counsel about the timing of the filing of the habeas petition.  (Government Ex. 4.)  Petitioner's conviction was affirmed in a summary order issued on November 14, 2008; the decision did not mention the instant habeas petition.  See United States v. Carmen Cardoso, 2008 U.S. App. LEXIS 23660 (2d Cir. 2008).

**2. Discussion**

Under 28 U.S.C. § 2255 (Section 2255), a person in federal custody is entitled to have her sentence vacated where "the [original] sentence was imposed in violation of the Constitution or laws of the United States … or is otherwise subject to collateral attack."  Petitioner here claims that she is entitled under Section 2255 to have her sentence vacated because of the government's failure to disclose to defense counsel prior to sentencing that by resuming drug trafficking, Diaz had breached his cooperation agreement with the government and had also possibly perjured himself at Petitioner's trial.  Simply put, Petitioner argues that the "government violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963) and 18 U.S.C. § 3500/Fed R. Crim. P. 26.2 by concealing this impeachment material from the defense while relying solely on Diaz's testimony to

establish [Petitioner's] supervisory role of the late 2004 importation of importation from Colombia."   In response, the Government contends that Petitioner's <u>Brady</u> claim is procedurally barred because it was raised during Petitioner's appeal.   In the alternative, the Government asserts that Petitioner's claim can be rejected because she "cannot establish a reasonable probability that the outcome of her sentencing would have been different" had she been apprised of this information prior to sentencing.

      A.   <u>Petitioner's Claim is not Procedurally Barred</u>

A Section 2255 petition is not a "substitute for direct appeal." <u>Sapia v. United States</u>, 433 F.3d 212, 217 (2d Cir. 2005).  Rather, a "collateral attack on a final judgment in a criminal case is generally available under Section 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice."  <u>United States v. Bokun</u>, 73 F.3d 8, 12 (2d Cir. 1995).  Accordingly, it is "well established that a Section 2255 petition cannot be used to relitigate questions which were raised and considered on direct appeal."  <u>United States v. Sanin</u>, 252 F.3d 79, 83 (2d Cir. 2001); <u>see also</u> <u>Riascos-Prado v. United States</u>, 66 F.3d 30, 33 (2d Cir. 1995) ("It is clear that section 2255 may not be employed to relitigate questions which were raised and considered on direct appeal.")  "The bar against relitigating claims extends to claims that <u>could have</u> been raised on direct appeal, but were not."  <u>United States v. Viertel</u>, 2009 U.S. Dist. LEXIS 193, *13 (S.D.N.Y. 2009) (emphasis added); <u>Akwuba v. United States</u>, 2007 U.S. Dist. LEXIS 44938, *11 (S.D.N.Y. 2007) (same)

Here, the Government contends that as the Diaz <u>Brady</u> materials (the letters from the government, the wiretap transcripts, and the DEA sheets from the proffer sessions

with Diaz) were part of the record on appeal, she could have raised this issue on her direct appeal, but chose not to.   In putting forth this argument, the Government acknowledges that courts of appeals can only review matters that were part of the record on appeal, see Wyler v. United States, 725 F.2d 156 (2d Cir. 1983) (matters not part of the district court record before the Court of Appeals are not ordinarily entitled to be reviewed); I.B.M. Corp. v. Edelstein, 526 F.2d 37, 45 (2d Cir. 1975) (absent extraordinary circumstances, federal appellate courts will not consider rulings or evidence that are not part of the trial record); Wyndham Associates v. Bintliff, 398 F.2d 614, 620 (2d Cir. 1968) (same), and that the Diaz materials were not part of the record on appeal when briefing was completed in this case in November, 2007.  However, relying on Fed R. App. P. 10(a)(1), which states that the record on appeal is composed of "the original papers and exhibits filed in the district court," the Government contends that at the moment the Section 2255 petition was filed with this Court, three days before the oral argument on the appeal was to be held, the petition and the accompanying documents became part of the "record on appeal," and therefore, could have been reviewed by the Court of Appeals.  (03/26/09 Tr. at 48.)

       The Government's argument fails because even if the Diaz Brady material was part of the record on appeal, simply including this evidence in the appellate record does not mean that this issue could have been raised and decided on direct appeal.  Rather, under Fed. R. App. P. 28(a)(6), appellants are required to advance all arguments in their appellate briefs, and the failure to include an argument in the appellate brief waives that argument on direct appeal.  See, e.g., Frank v. United States, 78 F.3d 815, 832-33 (2d Cir. 1996); United States v. Restrepo, 986 F.2d 1462, 1462-63 (2d Cir. 1993).  Accordingly,

because the direct appellate briefing was completed prior to the release of the Diaz <u>Brady</u> material, and because Petitioner's appellate counsel then took reasonable steps to supplement the appellate briefing by filing a motion to hold the appeal in abeyance, which the Government opposed and the Second Circuit did not address, this issue could not have been raised on direct appeal, despite Petitioner's best efforts to do so.[2]

      B.   <u>The Government's Brady/Jenck's Act Violation Entitles Petitioner To Be Resentenced</u>

Under <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963) and its progeny, the government must disclose evidence in its possession that is favorable to a defendant where the evidence is material either to guilt or to punishment.  Evidence is "favorable" if it tends to exculpate the defendant, <u>see id.</u> at 89, or if it impeaches the credibility of a government witness.  <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667, 676-77) (1985); <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).  The government's obligation to disclose <u>Brady</u> evidence extends through sentencing.  <u>See</u> <u>Brady</u>, 373 U.S. at 87; <u>see also</u> <u>East v. Scott</u>, 55 F.3d 996, 1002 (5th Cir. 1995) (applying <u>Brady</u> to sentencing proceedings).

There are three essential components to a Brady violation: 1) that the evidence at issue was favorable to the accused, either because it is exculpatory or because it is impeaching; 2) that the evidence must have been suppressed by the Government, either

---

[2] Further, and contrary to the Government's argument that this type of claim should have been fully presented at oral argument of Petitioner's direct appeal, the Second Circuit in <u>Chang v. United States</u>, 250 F.3d 79 (2d Cir. 2001) had in fact surmised that the use of a Section 2255 petition for circumstances like those of Petitioner is the appropriate and recommended method for raising such a claim.  <u>See</u> <u>Id.</u> at 86 ("a court may use methods under Section 2255 to expand the record" to evaluate the petitioner's claim, and potential methods available to the court to supplement the record include "letters, document evidence, and, in an appropriate case, even affidavits.")  Further, that this issue was briefly raised by the Second Circuit at oral argument does not mean that this issue could have been raised on direct appeal.  <u>See</u> <u>Warren v. Garvin</u>, 219 F.3d 111, 113 n.2 (2d Cir. 2000) (declining to consider an issue addressed only at oral argument); <u>United States v. Barnes</u>, 1997 U.S. App. LEXIS 662, *5 (2d Cir. 1997) (raising argument for the first time at oral argument does not present the argument for appellate review).

willfully or inadvertently; and 3) that the defendant suffered prejudice as a result.  See
United States v. Paulino, 445 F.3d 211, 224 (2d Cir. 2006).  In determining whether the
suppressed evidence caused prejudice to Petitioner, the relevant query asks whether
"there is a reasonable probability that, had the evidence been disclosed to the defense, the
result of the proceeding would have been different.'"  United States v. Madori, 419 F.3d
159, 169 (2d Cir. 2005) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987)).  The
"reasonable probability" standard does not require a petitioner to demonstrate "that
disclosure of the suppressed evidence would have resulted ultimately" in a lower
sentence for the petitioner.  Kyles, 514 U.S. at 434.  Rather, a "reasonable probability of a
different result is accordingly shown when the government's evidentiary suppression
'undermines confidence'" in the actual sentence received by the petitioner.  Id. (quoting
Bagley, 473 U.S. at 678); see also Madori, 419 F.3d at 169.

Here, the Government does not deny that the evidence concerning Diaz's
narcotics trafficking was favorable to Petitioner as it would have impeached Diaz's
credibility.  The Government also does not deny that it (inadvertently) suppressed this
evidence at the time of Petitioner's sentencing.  Kyles, 514 U.S. at 437 ("the individual
prosecutor has a duty to learn of any favorable evidence known to the others acting on the
government's behalf in the case, including the police).  Rather, the Government claims
that Petitioner suffered no prejudice from the suppression of this impeachment evidence
because there was no "reasonable probability that the outcome of her sentencing would
have been different."

The Court, however, is persuaded that the suppression of the impeachment
evidence by the Government undermines confidence in the sentence Petitioner ultimately

received.  In that regard, the evidence relied on by the Government at the sentencing hearing in support of its request that Petitioner receive a three-level sentencing enhancement for her supervisory role of the narcotics trafficking ring was the trial testimony of Diaz, which purported to establish Petitioner's leadership and organizational role in the late 2004 importation of heroin from Colombia.  Upon being presented with the trial testimony of Diaz, which was the only direct evidence cited at the sentencing hearing that supported the Government's claim that Petitioner was a (3-level) supervisor, the Court deemed Petitioner a supervisor (Sentence Tr. at 50), which merited a three-level sentencing enhancement under Section 3B1.1(b) of the Federal Sentencing Guidelines.

With this three-level enhancement, Petitioner's offense level was 39, which gave her an advisory sentencing range of 262-327 months imprisonment.  (Sentence Tr. at 63-64.)  Had the Court heard the impeachment material gathered by the Government, which established that Diaz, in effect, had violated the terms of his cooperation agreement by trafficking drugs and had possibly lied at trial when he gave an overview of his criminal history to the jury, the Court could have rejected Diaz's testimony in its entirety, which would have resulted in Petitioner not being adjudged a supervisor.  Without the three-level enhancement for supervision, her offense level would have been 36, with an advisory range of 188-235 months imprisonment.

In addition to the upward enhancement due to Petitioner's supervisory position, the Court's finding that she was a supervisor meant she could not claim a downward adjustment of three levels for having played a "minor role" in the conspiracy under U.S.S.G. §§ 3B1.2(b), 2D1.1(a)(3).  If she had been successful at attaining a three-level

downward adjustment for playing a minor role in the drug ring, Petitioner's offense level would have been 33, resulting in an advisory range of 135-168 months.  (Royle Decl., Ex. J [Defendant's April 1, 2007 letter to the Court].)

Further, the Court's finding that Petitioner supervised a conspiracy precluded consideration of Petitioner's argument that she should have been sentenced under the statutory "safety valve," which could have resulted in a sentence below the ten-year mandatory minimum.   18 U.S.C. § 3553(f)(4); U.S.S.G. § 5C1.2.   "Safety valve" treatment is not available to persons found to have supervised crimes.  Id.  And, had she been found eligible for safety valve treatment, she might have been entitled to a two-point downward adjustment under U.S.S.G. § 2D1.1(b)(11), even if the Court declined to sentence her to less than the mandatory minimum.  This two-point deduction could have reduced her offense level to as low as 31, which has an advisory range of 108-135 months (9 to 11 years), and which is far less than the 150 months sentence Petitioner actually received.   Accordingly, based on the totality of the aforementioned circumstances, Petitioner has presented sufficient evidence demonstrating that the failure of the Government to turn over the Diaz impeachment material may "undermine confidence" in the actual sentence Petitioner received.

The Government argues that Defendant suffered no prejudice from the suppression of the impeachment evidence.  The Government first contends that even if this impeachment evidence concerning Diaz was taken into account at sentencing, Petitioner still would have been found to be a supervisor under the Sentencing Guidelines.  In that regard, the Government asserts that the Court may very well have continued to rely on Diaz's testimony even with the new impeachment evidence.  The

Government also points to two pieces of evidence that it claims would have supported the conclusion that Petitioner supervised a heroin conspiracy: telephone records showing that Petitioner and Diaz spoke on a number of occasions on the day that heroin was due to arrive in New York, and the trial testimony of Petitioner's son, where he explained that Petitioner was involved in the heroin conspiracy and that he acted at his mother's direction following the seizure of the heroin by the police.

However, while it is true that the Government could have still relied on Diaz's testimony to establish Petitioner's supervisory role, the nature and breath of the impeachment evidence was sufficient to put forth a "reasonable probability" that the Court would not have so relied on Diaz's trial testimony.  Moreover, while the Government purports now to rely on additional evidence to establish Petitioner's supervisory role, none of this evidence presented at the time of sentencing.  See, e.g., United States v. Al-Sadawi, 432 F.3d 419, 426-27 (2d Cir. 2005) (supervisory enhancement requires the Government to establish at sentencing by a preponderance of the evidence that a defendant "exercise[d] some degree of control over others involved in the commission of the offense, or play[ed] a significant role in the decision to recruit or to supervise lower-level participants").

The Government next argues that there was no reasonable probability that her sentence would have been lower because Petitioner received a sentence of 150 months, which was well below the allotted guidelines range of 262-327 months.  According to the Government, this negated the "practical effect of the Court's earlier finding that a role enhancement technically applied" because even if the role enhancement was removed, the new Guidelines range of 188 to 235 months was still far higher than the 150 months

sentence she actually received.   This may be true, and Petitioner is certainly not guaranteed a lower sentence upon resentencing.   However, for the reasons explained, Petitioner has put forth a reasonable probability that the sentence would have been different had she not received a three-level enhancement for supervising the narcotics ring.

Finally, the Government argues that Petitioner would not have been given a three-level point reduction for being a minor participant in the drug trafficking ring, nor would she have been granted "safety valve" relief and thereby made eligible for a sentence below the ten-year statutory minimum.   In that regard, the Government recites a litany of evidence from the trial to establish that Petitioner's role in the drug ring was far from minor.   Further, the Government contends that Petitioner was not eligible for "safety valve relief even in the absence of a role enhancement" because she cannot show that prior to sentencing she "truthfully provided to the Government all information and evidence [she] ha[d] concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan," as the safety valve statute requires.

Once again, none of this additional evidence to refute the "minor participant" or "safety valve" issues was presented at time of sentencing.   Instead, discussion of the "minor participant" and "safety valve" issues was foreclosed once the Court determined that Petitioner was a supervisor.   And while the Government might be correct that these avenues of relief are indeed foreclosed to Petitioner, the principles of due process mandate that Petitioner at least be permitted to argue at sentencing, based on the entirety of the evidence, that she is entitled to such reductions.   Put differently, at resentencing,

Petitioner and the Government will both have the opportunity to make their respective cases on sentencing enhancements or reductions with the benefit of a complete record.

Accordingly, Petitioner's Section 2255 motion is granted to the extent that she will be resentenced by this Court on August 21, 2009, should she so choose.[3]

C. <u>Petitioner's Motion for Additional Discovery is Denied</u>

Petitioner seeks "discovery into the facts and circumstances of Diaz's illegal activities in the fall and winter of 2006 and 2007, and the government's knowledge of them." Specifically, Petitioner seeks discovery of 1) when Diaz resumed his criminal narcotics trafficking and whether it comprised any illegal acts not reported in the transcripts, reports, and notes disclosed to date; 2) whether Diaz was engaged in any other undisclosed illegal activity at or around the time of his trial testimony on October 20, 2006, and no later than Petitioner's sentencing on April 10, 2007; and 3) when the government knew or should have known of Diaz's illegal activities. According to Petitioner, discovery is necessary because these facts bear directly upon the legal standard to be applied to her application for relief under Section 2255, as well as the type of relief that is appropriate.

However, unlike civil litigation in federal court, a habeas petitioner "is not entitled to discovery as a matter of course." <u>Bracy v. Gramley</u>, 520 U.S. 899, 904 (1997). Rather, Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Court provides that a "judge may, for good cause, authorize a party to conduct

---

[3] Petitioner also contends that the failure of the government to turn over the impeachment material here was a violation of the Jencks Act and Rule 26.2, which requires the disclosure of statements made by a government witness. <u>United States v. Gonzalez</u>, 110 F.3d 936, 943 (2d Cir. 1997). Because the Court has determined that the Government committed a <u>Brady</u> violation at sentencing, and that the appropriate sanction for this is Petitioner's resentencing, there is no need for the Court to consider whether the Government also committed a Jencks Act violation of constitutional magnitude.

discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."  A showing of good cause requires "specific allegations" showing "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief."  <u>Bracy</u>, 520 U.S. at 908-09.  "Generalized statements about the possible existence of material do not constitute good cause."  <u>Green v. Artuz</u>, 990 F. Supp. 267, 271 (S.D.N.Y. 1998).

Petitioner maintains that the requested information is relevant to determining the "appropriate legal standard to apply" to Petitioner's request for resentencing pursuant to Section 2255.  In that regard, Petitioner contends that if the discovered evidence demonstrates that Diaz perjured himself, and the government knew or should have known about the perjury at the time of trial or sentencing, then Petitioner need only meet a lower "reasonable likelihood" standard  to be entitled to relief.  <u>See</u> <u>United States v. Agurs</u>, 427 U.S. 97, 103-04 (1976) (in cases where the government has knowingly presented perjured testimony, relief is warranted if "there is any reasonable likelihood" that the false evidence could have effected the Court's judgment).  In this case, Petitioner has not shown a reasonable likelihood that the government knowingly presented perjured testimony at time of trial, and accordingly, Defendant's request for discovery on this ground is denied.

Additionally, Petitioner claims that discovery is necessary because the information that has been disclosed suggests that she may be entitled to relief under Section 2255 beyond resentencing.  Petitioner does not state directly what type of additional relief would be appropriate (03/26/09 Tr. 35-37), but assuming that she is contemplating making a motion to vacate her conviction, Petitioner has not put forth

"specific allegations" showing "reason to believe" that she may, "if the facts are fully developed, be able to demonstrate that she is" entitled to that particular relief.  Bracy, 520 U.S. at 908-09.

In that regard, the impeachment evidence at issue here pertained solely to Diaz, and Diaz was a single witness who testified against Petitioner in connection with a heroin delivery in November 2004.  There was other evidence of Petitioner's involvement in the November 2004 heroin transaction, including the records showing telephone contact between Petitioner and Diaz on the day the heroin was being delivered to New York, as well as Petitioner's son's testimony about Petitioner's involvement in the importation of the heroin and the steps they took together to protect her and Nelson Solano in the aftermath of the seizure and arrest of Diaz.

Further, there was evidence that Petitioner was involved in drug deals having nothing to do with Diaz and the November 2004 heroin shipment.  This included the testimony of witnesses about their negotiations with Petitioner regarding, first, a 200-kilogram load of cocaine and then a 125-kilogram load of cocaine; consensual recordings between Petitioner and persons engaged in the narcotics conspiracy; wiretap records and records demonstrating that Petitioner assisted other conspirators in the importation of heroin; and, the testimony of Petitioner's son regarding her negotiations to have five kilos of cocaine sent to him.  Accordingly, in light of this overwhelming evidence, unrelated to Diaz, of Petitioner's guilt not only in the importation of the heroin in late 2004, but in her involvement in the narcotics trade, Petitioner has not shown good cause or put forward any specific allegations evincing that further discovery would entitle her to the vacatur of her conviction..

Accordingly, Petitioner's motion for discovery under Rule 6(a) is denied.

## 3. Conclusion

Petitioner's Section 2255 petition is GRANTED to the extent that if she so chooses, she will be resentenced by this Court on August 21, 2009 at 10:00 a.m. Petitioner is directed to inform the Court by August 10, 2009 at 4:00 p.m. if she wishes to be resentenced. Petitioner's request for additional discovery is DENIED.


IT IS SO ORDERED

Dated: New York, New York
        July 28, 2009

Robert P. Patterson, Jr.
U.S.D.J

Copies of this Opinion & Order sent to:

*Counsel For Petitioner*:
George Royal V
Latham and Watkins LLP
885 Third Avenue
New York, New York 10022
Fax: 212-751-4864

Sam Schmidt
111 Broadway, Suite 1305
New York, New York 10006

*Counsel for Respondent*:
Levin Dassin, Acting United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
Attn:   Virginia Chavez Romano, A.U.S.A.
        Jocelyn Strauber, A.U.S.A.
Fax: 212-637-2387